*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| ALEX H., | ) | |
| | ) | Supreme Court No. S-16206 |
| Appellant, | ) | |
| | ) | Superior Court Nos. 4FA-13-00100/ |
| v. | ) | 00101/00109 CN |
| | ) | |
| STATE OF ALASKA, DEPARTMENT | ) | O P I N I O N |
| OF HEALTH & SOCIAL SERVICES, | ) | |
| OFFICE OF CHILDREN'S SERVICES, | ) | No. 7151 – February 10, 2017 |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Michael P. McConahy, Judge.

Appearances: Rachel Cella, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant. Mary Ann Lundquist, Senior Assistant Attorney General, Fairbanks, and James E. Cantor, Acting Attorney General, Juneau, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, and Bolger, Justices. [Carney, Justice, not participating.]

WINFREE, Justice.

## I.   INTRODUCTION

A prisoner challenges the superior court's denial of his request for transport to attend in person his parental rights termination trial, and, therefore, the ultimate termination of his parental rights. He argues that when denying his transport request the

court:  (1) abused its discretion by concluding in its statutory analysis that transport was not required; (2) abused its discretion or erred by failing to consider all required factors for the statutory analysis; and (3) separately violated his due process rights by denying him in-person attendance at the parental rights termination trial.  Because the superior court considered all relevant factors the parties presented to it, because it is not obvious that considering additional factors would have changed the court's statutory analysis, and because the prisoner's due process rights were not violated, we affirm the superior court's transport decision and ultimate termination of the prisoner's parental rights.

## II.    FACTS AND PROCEEDINGS

Alex and Maeve H. were married and the biological parents of daughter Portia, son Roman, and daughter Audra, aged 18, 16, and 14, respectively, at the time of the parental rights termination trial.[1]  In early October 2013 the Office of Children's Services (OCS) received allegations that Portia and Audra were being sexually abused by Roman; OCS filed an emergency petition to adjudicate the two sisters as children in need of aid and obtain temporary custody.

In forensic interviews Portia and Audra reported that Alex frequently had genital, anal, and oral sex with them, and that this abuse started when they were as young as four years old.  Both sisters reported that Roman had told them that Alex had penetrated him anally, as well.  The sisters both described an incident when Alex forced all three children to have oral and vaginal sex with him and each other.  Portia said she had told Maeve about the abuse multiple times, but Maeve had done nothing to intervene.  OCS subsequently filed an emergency petition to adjudicate Roman as a child in need of aid and obtain temporary custody.

---

[1]      Pseudonyms are used to protect the family's privacy.

Alex was arrested and indicted for 27 counts of first degree sexual abuse of a minor. OCS petitioned in September 2014 to terminate Alex's and Maeve's parental rights. The parties agreed to conduct the termination trial after Alex's criminal trial was completed. The children's guardian ad litem preferred waiting for the criminal case to conclude before conducting the termination trial because the children might then be exposed to confrontation only once — the children's criminal case testimony could be admitted in the termination case so that they would not have to testify a second time.

Alex's criminal trial concluded on August 14, 2015, when a jury found him guilty of 13 counts of first degree sexual abuse of a minor. All three children testified at the criminal trial, as did both Maeve and Alex.

At a July pretrial conference — shortly before Alex's criminal trial — the parties scheduled the termination trial for early October. On September 28, one week before the scheduled termination trial and only one day prior to the final pretrial conference, Alex sought an order pursuant to AS 33.30.081(f) requiring the Alaska Department of Public Safety (DPS) to transport him from the Fairbanks jail to the Fairbanks courthouse so he could attend the termination trial in person.[2] Alex stated that although he did not intend to testify, his in-person attendance was necessary to avoid the inefficiencies of telephonic participation and facilitate his ability to confront witnesses

---

[2]     AS 33.30.081(f) provides that:

A court may order a prisoner who is a party or witness to a civil action or a witness to a criminal action to appear at a place other than within a correctional facility only if the court determines, after providing a reasonable opportunity for [DPS] to comment, that the prisoner's personal appearance is essential to the just disposition of the action. In making its determination, the court shall consider available alternatives to the prisoner's personal appearance including deposition and telephone testimony.

and assist counsel in his defense, "ensur[ing] optimal protection of [his] trial rights." The other parties to the termination trial did not oppose the request, but pursuant to the statute the superior court provided DPS an opportunity to respond. DPS filed a written opposition contending that Alex's in-person attendance at the termination trial would add little value because he did not intend to testify, but that DPS would face significant burdens in accommodating the request because it had little time to make necessary arrangements and already had other significant obligations during that period. On October 5, the first day of the trial, the court confirmed that no parties had anything to add to the DPS opposition and then denied the transport request, concurring with the analysis in DPS's opposition.

In January 2016 the superior court terminated both Alex's and Maeve's parental rights to all three children.[3] Alex appeals the termination order, arguing that the

---

[3]      Under relevant Alaska Child in Need of Aid (CINA) statutes and rules, parental rights may be terminated at trial only if OCS shows:

> (1) by clear and convincing evidence that
>
>> (A) the child has been subjected to conduct or conditions described in AS 47.10.011 and
>>
>>> (i) the parent has not remedied the conduct or conditions in the home that place the child at substantial risk of harm; or
>>>
>>> (ii) the parent has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury; [and]
>>
>> . . . .
>>
>> (2) by clear and convincing evidence that

(continued...)

-4-                                                                                          7151

court abused its discretion and erred by denying the statutory transport request and that his right to due process was violated when the court denied him the right to personally attend the termination trial.[4]

## III. STANDARD OF REVIEW

We generally review decisions regarding prisoner transport under AS 33.30.081(f) for abuse of discretion.[5] "We will find an abuse of discretion when the decision on review is manifestly unreasonable."[6] Additionally, "[a]n abuse of discretion exists where the superior court 'considered improper factors in making its . . .

---

[3]    (...continued)

        (A) the Department has complied with the provisions of AS 47.10.086 concerning reasonable efforts; [and]

    . . . .

        (3) by a preponderance of the evidence that termination of parental rights is in the best interests of the child.

CINA Rule 18(c); *see also* AS 47.10.088 (establishing requirements for termination).

[4]    In his Statement of Points on Appeal Alex challenged the superior court's substantive findings concerning termination, but in his briefing he argues only that his procedural rights were violated by the denial of his transport request. Any challenge to the court's substantive findings is waived. *See, e.g.*, *Wasserman v. Bartholomew*, 38 P.3d 1162, 1171 (Alaska 2002) (holding that party waived issue listed in points on appeal but not briefed).

[5]    *Richard B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 71 P.3d 811, 817, 826-28 (Alaska 2003).

[6]    *Fink v. Municipality of Anchorage*, 379 P.3d 183, 188 (Alaska 2016) (quoting *Ranes & Shine, LLC v. MacDonald Miller Alaska, Inc.*, 355 P.3d 503, 508 (Alaska 2015)).

determination, failed to consider statutorily mandated factors, or assigned disproportionate weight to particular factors while ignoring others.' "[7]

"We review de novo whether a decision requiring a parent who is a state prisoner to participate telephonically rather than be transported violates his right to due process."[8] "On that question, we will adopt the rule most persuasive in light of precedent, reason, and policy."[9]

## IV. DISCUSSION

### A. The Superior Court Did Not Abuse Its Discretion By Denying Alex's Statutory Transport Request.

Alaska Statute 33.30.081(f) provides that a court may order transport of a prisoner who is a party to a civil action "only if the court determines . . . the prisoner's personal appearance is essential to the just disposition of the action. . . . [T]he court shall consider available alternatives to the prisoner's personal appearance including deposition and telephone testimony." In *Richard B. v. State, Department of Health & Social Services, Division of Family & Youth Services* we identified and adopted factors other states commonly use when considering prisoner transport requests: (1) "costs and inconvenience of transporting a prisoner"; (2) "potential danger or security risk"; (3) "substantiality of the matter"; (4) "need for an early determination of the matter"; (5) "possibility of delaying trial until the prisoner is released"; (6) "probability of success on the merits"; (7) "integrity of the correctional system"; and (8) "interests of the inmate

---

**7** *Red Elk v. McBride*, 344 P.3d 818, 822 (Alaska 2015) (quoting *Siekawitch v. Siekawitch*, 956 P.2d 447, 449 (Alaska 1998)).

**8** *Seth D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1222, 1226 (Alaska 2008) (citing *Richard B.*, 71 P.3d at 817).

**9** *Richard B.*, 71 P.3d at 817.

in presenting . . . testimony in person."[10] We have observed that AS 33.30.081(f) "vests significant discretion in the trial court" to make transport determinations, and that "[a]s with any discretionary decision, trial courts must carefully weigh all relevant factors."[11]

Alex argues that the superior court abused its discretion by denying his AS 33.30.081(f) transport request. He contends that the court "misapplied the law by adopting DPS's incorrect analysis of the transport issue," and that even if the analysis were proper, the court abused its discretion by "reach[ing] the wrong result based on the information before it." Alex also suggests that by giving weight to his choice not to testify at trial, the court "exact[ed] a penalty" for asserting his right against self-incrimination.

**1.      The superior court's decision, based on the factors presented to it, was not an abuse of discretion.**

We first address Alex's claim that the superior court abused its discretion by "reach[ing] the wrong result based on the information before it," namely the arguments, authority, and factors presented in Alex's transport motion and DPS's opposition.

Both Alex and DPS failed to bring to the superior court's attention the eight factors we adopted in *Richard B.* for "deciding whether to grant an incarcerated parent's request to be transported to a termination trial" under AS 33.30.081(f).[12] The only factors Alex identified were those from the *Mathews v. Eldridge* balancing test, which

---

[10]      *Id.* at 827 (quoting *B.H. v. W.S. (In re F.H.)*, 283 N.W.2d 202, 209 (N.D. 1979)) ("We agree that these factors are among those a trial court should consider in deciding whether to grant an incarcerated parent's request to be transported to a termination trial.").

[11]      *Id.*

[12]      *Id.*

-7-                                                          **7151**

we employ to determine whether a prisoner has a due process right to be transported to a parental rights termination trial.[13] Those factors, as summarized by Alex, are "[1] the nature of [the] private interest affected by state action, [2] the risk of an erroneous deprivation through the procedures utilized and the probable value of other procedural safeguards," and "[3] the government's interests, including fiscal and administrative burdens that might result." Alex made no express reference to the separate statutory inquiry guided by the factors set forth in *Richard B.* DPS listed the following four factors: (1) "whether the matter is one being prosecuted by the State of Alaska, as opposed to one initiated by the prisoner"; (2) "the importance of the interest at issue"; (3) "the probable value added by in[-]person attendance rather than telephonic participation"; and (4) "the [S]tate's interest in avoiding the costs, administrative burdens, and diversion of its limited resources to transport of the prisoner." The first factor DPS cited was derived from our due process analysis in *Richard B.*; the latter three factors likewise came from that due process analysis and are essentially reformulations of the same *Mathews* factors Alex relied on in his motion.[14]

Alex concedes that the four factors the superior court relied on were all relevant to its inquiry whether transport was required under AS 33.30.081(f). Although the superior court was not presented all of the prescribed factors, its decision nonetheless addressed the most relevant considerations identified by *Richard B.* because of the substantial overlap between the *Richard B.* factors and the *Mathews* due process factors.[15]

---

[13] *Id.* at 829-33 (applying *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), balancing test to due process claim).

[14] *See Richard B.*, 71 P.3d at 830-32.

[15] Three factors the superior court relied on correspond closely with factors *Richard B.* adopted for use in the AS 33.30.081(f) analysis: "[t]he importance of the
(continued...)

We will address below the superior court's failure to consider the remaining *Richard B.* factors. But having identified this limitation in the court's AS 33.30.081(f) analysis, to address Alex's claim that the court abused its discretion by "reach[ing] the wrong result based on the information before it" we first review the factors the court did consider. We then consider whether its decision on the basis of those factors was "manifestly unreasonable."[16]

### a. First factor: The State was bringing the action

The first factor the superior court considered was "whether the matter is one being prosecuted by the State of Alaska, as opposed to one initiated by the prisoner." DPS conceded in its opposition, and the court concurred, that factor favored Alex because OCS initiated the termination trial.

DPS imported this factor from the *Richard B.* due process discussion, and it does not neatly align with any of the eight factors we said courts should consider when determining whether AS 33.30.081(f) requires transport.[17] But it was not inappropriate

---

[15]      (...continued)
interest at issue" corresponds with the third *Richard B.* factor ("the substantiality of the matter"); "the probable value added by in[-]person attendance" corresponds with the eighth factor ("the interests of the inmate in presenting . . . testimony in person"); and "the state's interest in avoiding the costs, administrative burdens, and diversion of its limited resources" corresponds with the first factor ("the costs and inconvenience of transporting a prisoner"). *See id.* at 827, 830-32. The other factor DPS raised, "whether the matter is one being prosecuted by the State," does not closely correspond with any *Richard B.* factor.

[16]      *Fink v. Municipality of Anchorage*, 379 P.3d 183, 188 (Alaska 2016) (quoting *Ranes & Shine, LLC v. MacDonald Miller Alaska, Inc.*, 355 P.3d 503, 508 (Alaska 2015)).

[17]      *See* 71 P.3d at 827, 830-32 (applying this consideration when determining whether prisoners have a per se due process right to transport, before proceeding to the
(continued...)

for the court to consider this factor when conducting its statutory analysis. The *Richard B.* factors are not exclusive,[18] and just as under a due process analysis, it is relevant to the statutory analysis that the State is "attempting to use its power to deprive [the parent] of a fundamental right."[19] The superior court did not err by considering this factor and determining that it weighed in Alex's favor; it is relevant to "the just disposition of the action."[20]

### b. Second factor: The importance of the interest at issue

The second factor the superior court considered was "the importance of the interest at issue." This was derived from the first *Mathews* due process factor[21] and is analogous to the third *Richard B.* statutory factor.[22] Alex's parental rights were at issue; it is undisputed that "[p]arents have a fundamental right to the care and custody of their children and this right does not immediately cease when a parent is incarcerated."[23] In *Richard B.* we considered the importance of this right as a factor favoring transport under

---

[17]    (...continued)
*Mathews* inquiry).

[18]    *See id.* at 827 ("[T]hese factors are among those a trial court should consider . . . .").

[19]    *Id.* at 830.

[20]    AS 33.30.081(f); *see Richard B.*, 71 P.3d at 827 ("[T]rial courts must carefully weigh all relevant factors . . . .").

[21]    *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) ("the private interest that will be affected by the official action").

[22]    *See* 71 P.3d at 827 ("the substantiality of the matter at issue").

[23]    *Seth D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1222, 1230 (Alaska 2008).

AS 33.30.081(f).[24]   DPS conceded that this factor "weigh[ed] in favor of ordering transport" and the superior court agreed.

We briefly note an argument DPS made in its opposition:  that this factor "may be slightly diminished . . . given that [Alex] has already been convicted in a criminal case of sexually abusing . . . his children."  DPS argued the factor merited diminished consideration because Alex already had a legal proceeding with the opportunity "to be present and confront witnesses," he had been convicted under a higher burden of proof than he faced at the termination trial, and a material factual allegation against him had already been established. OCS endorses this reasoning on appeal, noting further that Alex had not intended to testify at the termination trial.  These arguments are misguided.   The importance of the underlying interest does not fluctuate based on procedural protections enjoyed in other contexts, the probable value of in-person attendance, the likelihood of success on the merits, or any other analogous variable. *Richard B.* provides eight factors and leaves room for more; each consideration listed above has a place in a prisoner transport analysis, but these considerations do not belong here where focus should remain on the "substantiality of the matter at issue."[25]

c.      **Third factor:  The probable value added by in-person as opposed to telephonic attendance**

The third factor the superior court considered was "the probable value added by in[-]person attendance rather than telephonic participation."  This factor was

---

[24]    71 P.3d at 827-28.

[25]    *Id.* at 827.

-11-                                                    **7151**

derived from the second *Mathews* due process factor[26] and is analogous to the eighth *Richard B.* statutory factor.[27]

In his transport request Alex indicated that he had no intention of testifying at the termination trial, but "asserted that his presence was necessary to ensure his ability to consult with his counsel in a meaningful fashion and in order to protect his interest in confronting and cross-examining the witnesses against him." Alex argued that telephonic participation "would necessarily dilute" his rights "to confront and cross-examine witnesses and assist counsel during trial"; he also expressed concern that "[t]elephonic participation . . . would . . . create inefficiencies during trial as [it] may necessitate frequent breaks" to consult with counsel.

But we have regularly found that in-person attendance at a termination hearing is not necessary to ensure a just disposition in general, or to safeguard the rights Alex cites in particular. We have recognized the particular importance of in-person attendance under the AS 33.30.081(f) analysis "where the credibility of a party or witness will likely affect the outcome of the case."[28] But where, as here, the prisoner does not intend to testify, or where the credibility of the testimony is not at issue, we have generally found that courts did not abuse their discretion in denying transport requests

---

[26] *See* 424 U.S. at 335 ("the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards").

[27] *See* 71 P.3d at 827 ("the interests of the inmate in presenting his testimony in person rather than by deposition").

[28] *Id.*

absent some specific showing why "the outcome of the case would depend upon" the prisoner's presence.[29]

In *E.J.S. v. State, Department of Health & Social Services* we held that a father was not denied his rights to effective assistance of counsel or to confront and cross-examine witnesses against him in a termination trial he attended telephonically, even though he alleged he could not hear the proceedings.[30] We noted that the father's attorney was present and effectively cross-examined the witnesses, that the father could hear the proceedings well enough to promptly respond to questions posed to him, and that telephonic participation was authorized by court rule.[31] Similarly, Alex's attorney was present and conducted effective cross-examination, and as OCS noted she "objected to the admission of certain evidence and otherwise participated" in the trial. The superior court regularly ensured that Alex could hear the proceedings, and his attorney consulted with him in private throughout the trial. And here the superior court not only was authorized to consider the viability of telephonic participation, it was required by statute to do so.[32]

Alex failed to provide the superior court any specific showing that he needed greater protections under AS 33.30.081(f) than those afforded to parents in similar circumstances. He raised concerns about "inefficiencies" resulting from

---

[29]    *Id.* at 828; *see also Seth D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1222, 1229-30 (Alaska 2008) (holding the court did not abuse its discretion where the prisoner "failed to demonstrate that his physical presence was needed at the trial to assist his attorney").

[30]    754 P.2d 749, 752 (Alaska 1988).

[31]    *Id.* (citing Alaska R. Civ. P. 99; CINA Rule 3(f)).

[32]    *See* AS 33.30.081(f) ("[T]he court shall consider available alternatives . . . including telephone testimony."); *see also* Alaska R. Civ. P. 99 (authorizing telephonic participation in civil cases); CINA Rule 3(g) (authorizing telephonic participation).

telephonic participation, but provided no argument that any such inefficiencies were unique to his case and not routine inconveniences. The superior court did not clearly err in determining that in-person attendance added little, if any, probable value over telephonic attendance.

### d. Fourth factor: The State's interest against transport

The fourth factor the superior court considered was "the [S]tate's interest in avoiding the costs, administrative burdens, and diversion of its limited resources to transport of the prisoner." This was derived from the third *Mathews* due process factor[33] and is analogous to the first *Richard B.* statutory factor.[34]

In *Seth D. v. State, Department of Health & Social Services, Office of Children's Services* we advised that when opposing transport requests the State "must provide a specific showing" detailing what expenses and burdens it expected to incur if the transport were ordered.[35] The showing might address issues such as how the transport would "affect[] personnel assignments, security, and expense" and any security risks the prisoner posed.[36]

DPS made a specific showing when it opposed Alex's transport request. DPS detailed the costs and burdens that transport would impose, including not only the resource expenditure associated with transporting Alex from the Fairbanks jail to the Fairbanks courthouse, but also the burden of flying in an additional judicial service

---

[33]    *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) ("the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail").

[34]    *See* 71 P.3d at 827 ("the costs and inconvenience of transporting a prisoner from his place of incarceration to the courtroom").

[35]    175 P.3d 1222, 1231 (Alaska 2008).

[36]    *Id.*

officer from Anchorage and stationing that officer in Fairbanks for the week of the trial. Alex argues that: those latter burdens are not properly attributable to him and should therefore not factor into the inquiry; under a proper accounting this factor favors him; and the superior court thus abused its discretion by denying his transport request in reliance on DPS's accounting.

Central to the argument that the burdens are attributable to Alex is the fact that he submitted his transport request only one week before the trial was scheduled to commence. The superior court found it "problematic that [Alex] wait[ed] until the eleventh hour to seek relief for an issue he contends is a fundamental due process consideration" when he had known the date of the trial for more than two months and had been in custody for most of that time. DPS was facing significant logistical challenges in Fairbanks during the week of Alex's trial due to a lengthy ongoing multi-litigant trial; judicial service officers were already being flown in to accommodate staffing shortages. DPS asserted a substantial burden if the transport request were granted because "other court orders already in place or expected" limited its available resources, and the "last minute nature of [the] request does not provide sufficient time to re-arrange work schedules for judicial service officers in Fairbanks . . . , much less rearrange scheduled leave or training."

Alex argues that DPS should not "assign[] its staffing shortages and consequent reshuffling of resources to [him] as costs of transport. DPS should not be permitted to use creative cost-accounting strategies to deny a parent's transport motion." He further asserts that "if this tactic is permitted, it is unlikely that any prisoner will ever prevail on a transport motion because DPS will always be able to identify the proximate costs of a prisoner's transport in the manner it did here."

Alex's arguments might have had merit had he more promptly submitted his transport request and had he intended to testify at trial.[37] Alaska Statute 33.30.081 obliges DPS to transport indigent prisoners who are parties to civil actions when the "prisoner's personal appearance is essential to the just disposition of the action," and DPS is expected to allocate resources accordingly.[38] But as a consequence of Alex's tardiness in submitting his transport request and DPS's existing unique service obligations, DPS could not reasonably resolve logistical conflicts and avoid unexpected costs.[39] It was not error for the superior court to weigh this factor against Alex taking into account — along with his decision not to testify — the last-minute nature of his request and the preexisting constraints on DPS's limited resources.

### e. Weighing the factors

Alex alleges that the superior court abused its discretion by "reach[ing] the wrong result based on the information before it" when denying his AS 33.30.081(f) request for transport to attend his parental rights termination trial. But the court considered all of the factors presented in Alex's transport request and in DPS's opposition. It justifiably concluded that the first two factors weighed in favor of granting transport and the latter two factors weighed against. Because it concluded that the latter two factors were "more persuasive and clearly play[ed] into favor of the state," it

---

[37]     *Cf. id.* at 1234 (Fabe, J., concurring) ("[W]e have never held that the mere cost of transportation should suffice as grounds for denying a prisoner's right to testify in person where a fundamental right is at stake.").

[38]     AS 33.30.081(f)-(h).

[39]     *Cf. Richard B.*, 71 P.3d at 828 (holding that denying prisoner's transport request was not abuse of discretion when prisoner provided State less than a week to make necessary accommodations, and State would have had to incur substantial airfare and lodging expenses to meet request).

exercised its "significant discretion"[40] to deny the request. That decision was not "manifestly unreasonable."[41]

### 2. Alex waived his right to argue that the superior court failed to consider other necessary factors.

We next address Alex's argument that the superior court erred or abused its discretion because it "adopted DPS's improper analysis of the issues," considering only the four factors discussed above that were raised in DPS's opposition. As Alex notes, OCS "acknowledges that the court abuses its discretion when it . . . fails to consider required factors in reaching a decision," and "concedes that *Richard B.* sets forth eight factors courts should consider in deciding whether to grant an incarcerated parent's transport request."

OCS maintains that Alex's argument cannot serve as a basis for finding an abuse of discretion because the argument is new on appeal. OCS correctly notes that "Alex did not present to the [superior] court the eight factors" listed in *Richard B.* Although Alex cited AS 33.30.081(f), he asserted only due process arguments in support of his motion, making no mention of the separate statutory inquiry in general or the *Richard B.* factors in particular.[42]

---

[40]    *Id.* at 827.

[41]    *Fink v. Municipality of Anchorage*, 379 P.3d 183, 188 (Alaska 2016) (quoting *Ranes & Shine, LLC v. MacDonald Miller Alaska, Inc.*, 355 P.3d 503, 508 (Alaska 2015)).

[42]    Alex did cite the requirement we established under AS 33.30.081(f) that the State provide in its opposition "a specific showing" of what burdens and risks it would have to assume to meet a prisoner's transport request. *Seth D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1222, 1231 (Alaska 2008) But Alex addressed this as part of "the need for a strict examination of the parent's due process rights," making no reference to an independent statutory inquiry containing
(continued...)

Alex is correct that the superior court failed to consider all of the prescribed *Richard B.* factors.[43] But he failed to bring those factors to the court's attention, both in his original transport request and on the first day of trial when the court asked if the parties had anything to add to the DPS opposition before it ruled on the motion. Where a party has failed to sufficiently raise an issue below we generally consider that argument waived.[44] Alex waived his right to argue the superior court misapplied the law by failing to consider all eight *Richard B.* factors in conducting its prisoner transport analysis.

### 3. The superior court's failure to address all the *Richard B.* factors was not plain error.

Although Alex waived his right to argue that the superior court should have considered all eight *Richard B.* factors, we may nonetheless review the issue for plain error.[45] "[P]lain error exists in a CINA case where an obvious mistake has been made which creates a high likelihood that injustice has resulted."[46] There is no such high

---

[42]    (...continued)
considerations beyond those raised in the due process analysis.

[43]    *See* 71 P.3d at 827.

[44]    *See, e.g.*, *Sidney v. Allstate Ins. Co.*, 187 P.3d 443, 456 (Alaska 2008) (finding waiver where party made request in one-sentence statement and provided no justification or authority in support); *State Farm Mut. Auto. Ins. Co. v. Lawrence*, 26 P.3d 1074, 1077-78 (Alaska 2001) (holding that party waived two arguments, one by failing to argue it to the superior court and the other by failing to do so clearly (citing *Chijide v. Maniilaq Ass'n of Kotzebue, Alaska*, 972 P.2d 167, 173 (Alaska 1999))).

[45]    *See Kyle S. v. State, Dep't of Health & Soc. Servs.*, 309 P.3d 1262, 1267 (Alaska 2013) ("In CINA cases, we review issues that were not raised in the trial court for plain error." (citing *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1111 (Alaska 2010))).

[46]    *Remy M. v. State, Dep't of Health & Soc. Servs.*, 356 P.3d 285, 288 (Alaska 2015) (alteration in original) (quoting *Kyle S.*, 309 P.3d at 1267).

likelihood of injustice here because considering all eight factors would not have benefitted Alex.

Alex concedes the four factors the superior court relied upon were relevant to its AS 33.30.081(f) inquiry, but he asserts that the superior court failed to consider other *Richard B.* factors that favored him, namely: "the absence of security concerns and the minimal costs to transport [him] from his place of incarceration to the courthouse." His reference to the cost of transport is puzzling, as that was a significant portion of what DPS briefed and the superior court considered. Alex's reference to "the absence of security concerns" is less puzzling, as it is true DPS alleged no such concerns with respect to Alex. But it is clear from DPS's position that there were heightened security concerns at the Fairbanks courthouse during the week of Alex's trial, and given that neither party specifically raised this issue in the superior court, Alex provides no basis to conclude that this factor should affirmatively favor him, rather than simply remain neutral. And even assuming that this factor would favor him for purposes of this plain error analysis, it is outweighed by other considerations.

Most significantly Alex fails to acknowledge that the sixth *Richard B.* factor, "the probability of success on the merits,"[47] is not in his favor. Alex's criminal conviction is relevant to that inquiry. As the superior court ruled, "the doctrines of res judicata and collateral estoppel apply in this case with respect to [Alex's] criminal convictions, and . . . [Alex] did sexually abuse the three children." This virtually foreclosed the possibility that Alex's children would not be found in need of aid,[48]

---

[47]     71 P.3d at 827.

[48]     *See* AS 47.10.011(7) ("[T]he court may find a child to be a child in need of aid if it finds . . . that the child . . . has suffered sexual abuse . . . as a result of conduct by . . . the child's parent . . . ."); AS 47.10.088(a) (listing a finding that a child is in need of aid under AS 47.10.011 as the first element in the parental rights termination inquiry).

diminishing Alex's probability of success on the merits in his parental rights termination trial. In spite of that low probability Alex argues that his criminal conviction should have allowed him "enhanced protections" because he was "facing the destruction of [his] family." He quotes *Santosky v. Kramer* for the proposition that the fundamental right to parent "does not evaporate simply because [the parents] have not been model parents or have lost temporary custody of their child to the State."[49] But that case, involving federal due process rights, is not relevant to this independent statutory inquiry.[50] And because "probability of success on the merits" is one of the *Richard B.* factors courts should consider when ruling on transport requests brought under AS 33.30.081(f), Alex is mistaken in arguing that his criminal conviction entitles him to "enhanced protections" under the relevant statutory inquiry.

Alex makes no substantial argument that any *Richard B.* factor the superior court failed to consider would favor him, and he fails to recognize that at least one factor, the "probability of success on the merits," would militate strongly against him.[51] Because it is unlikely that consideration of the other *Richard B.* factors would have resulted in a different outcome, there is no "high likelihood that injustice has resulted" from the court's failure to sua sponte address those factors, and so there is no plain error.[52]

---

[49]    455 U.S. 745, 753 (1982).

[50]    *See Richard B.*, 71 P.3d at 826-31 (analyzing first whether transport was required under AS 33.30.081(f) and then whether it was required under due process).

[51]    *Id.* at 827.

[52]    *Remy M. v. State, Dep't of Health & Soc. Servs.*, 356 P.3d 285, 288 (Alaska 2015) (alteration in original) (quoting *Kyle S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 309 P.3d 1262, 1267 (Alaska 2013)).

### 4. The superior court did not exact a penalty for Alex's assertion of his right against self-incrimination.

Alex argues that his decision not to testify should not weigh against him in an AS 33.30.081(f) inquiry whether his presence was "essential to the just disposition of the action."[53] He argues that denying transport because he is not asserting his right to testify would "exact a penalty" for his "assertion of the right against self-incrimination" and maintains that he is "not required to give up his Fifth Amendment privilege . . . to prevail on a request to be transported to his termination trial." OCS argues that no penalty was exacted because Alex "fully participated in the trial."

We conclude that no penalty has been exacted on Alex's assertion of the right against self-incrimination. The inquiry under AS 33.30.081(f) enables prisoners to attend trials when their presence is "essential to the just disposition of the action."[54] If prisoners choose not to testify, their personal presence is less essential and they face heightened risk that transport may not be granted. But the "essential to a just disposition" inquiry ensures that prisoners' rights and interests are protected.[55] "Penalty" may be defined broadly in this context, but it still requires some "costly" "sanction";[56] here there is no sanction because the court ensured that Alex's rights would be

---

[53] AS 33.30.081(f). *But see id.* ("[T]he court shall consider available alternatives to the prisoner's personal appearance including deposition and telephone testimony.").

[54] AS 33.30.081(f).

[55] *Id.*

[56] *Armstrong v. Tanaka*, 228 P.3d 79, 82-85 (Alaska 2010) (quoting *Spevack v. Klein*, 385 U.S. 511, 515 (1967)) (holding that "proceedings must adequately protect the individual's overlapping rights," and that a penalty might be exacted on the assertion of the right against self-incrimination if declining to stay civil proceedings infringed on the party's "right of access to the courts").

sufficiently protected and the disposition of the action would not be affected by his telephonic participation. That he would have preferred to attend the trial despite the sufficiency of those protections does not alter this determination.

**B.    The Superior Court Did Not Violate Alex's Due Process Rights By Denying His Transport Request.**

We next consider Alex's constitutional due process claim.[57] The "right to the care and custody of one's own child is a fundamental right recognized by both the federal and state constitutions,"[58] and therefore "falls within the protections of the due process clause."[59] However, "case law has not established a procedural due process right of incarcerated parents to be transported to parental rights termination trials," even if the parent intends to testify in the proceeding.[60] Prisoner-transport cases are distinguishable from other fundamental rights due process cases requiring an in-person hearing:  the question in the latter is " 'whether a hearing officer must *permit an individual to appear* in person for a hearing,' whereas in a termination hearing 'we are asked to decide whether the state should be *required to transport a prisoner* . . . for a trial.' "[61]

"Although transportation of an incarcerated parent to attend a termination trial is not *required* by due process," we nonetheless in each case apply "the balancing

---

[57]    *See* U.S. Const. amend. XIV, § 1; Alaska Const. art. I, § 7.

[58]    *Seth D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1222, 1227 (Alaska 2008) (quoting *J.M.R. v. S.T.R.*, 15 P.3d 253, 257 (Alaska 2001)).

[59]    *Id.* at 1228 (quoting *Richard B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 71 P.3d 811, 831 (Alaska 2003)).

[60]    *Id.* at 1227 (citing *Richard B.*, 71 P.3d at 828).

[61]    *Id.* (emphasis in original) (quoting *Richard B.*, 71 P.3d at 829-30).

test of *Mathews v. Eldridge* to determine whether a parent was deprived due process."[62] That balancing test requires consideration of three factors:

> First, the private interest that will be affected . . . ; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.[63]

When applying this test we have noted that "[t]he crux of due process is opportunity to be heard and the right to adequately represent one's interests,"[64] but that the precise process due varies with the "particular set of circumstances" of the case.[65] In cases involving a prisoner petitioning for transport to a parental termination proceeding, courts must "consider all relevant factors, including the disputed issues, whether a parent plans to testify, the relevance of a parent's testimony to the disputed issues, the costs to the state . . . and any threat to public safety."[66]

---

[62]     *Id.* (emphasis added) (citing *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976); *Richard B.*, 71 P.3d at 831).

[63]     *Richard B.*, 71 P.3d at 829 (quoting *Mathews*, 424 U.S. at 335).

[64]     *In re K.L.J.*, 813 P.2d 276, 279 (Alaska 1991) (quoting *Matanuska Maid, Inc. v. State*, 620 P.2d 182, 192 (Alaska 1980)).

[65]     *Id.* at 278 (quoting *Arctic Structures, Inc. v. Wedmore*, 605 P.2d 426, 436 (Alaska 1979)); *see also Richard B.*, 71 P.3d at 833 ("Our holding today is limited and tied closely to the facts of this case.").

[66]     *Richard B.*, 71 P.3d at 833.

## 1. First factor: The private interest affected weighs in Alex's favor.

The first *Mathews* factor, "the private interest that will be affected," clearly weighs in Alex's favor, and OCS concedes as much.[67] It is well established that "[t]he right to custody of one's own child 'clearly falls within the protections of the due process clause and should be accorded significant weight.' "[68]

Although this first factor already weighs in Alex's favor, he attempts to gain further balancing weight by arguing that his parental rights are "not the only interest implicated in the court's decision" and that his right to counsel and right to present a defense were also affected and should receive consideration. Alex argues that "[b]oth of these fair trial rights are critical to the protection of the right to parent; thus, they deserve distinct consideration and weigh heavily in the due process balancing."

Alex's argument that these fair trial rights deserve independent consideration and balancing weight under the first factor of the *Mathews* test is unsound. The *Mathews* test's purpose is determining precisely what process is due in varying circumstances where it is alleged that existing procedures provide insufficient safeguard against the risk that official action will erroneously harm a private substantive interest;[69] its aim is not to protect procedural rights that already have attached, but to determine

---

[67]     *Seth D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1222, 1227 (Alaska 2008) (quoting *Richard B.*, 71 P.3d at 829). *See id.* at 1227-28 (first quoting *J.M.R. v. S.T.R.*, 15 P.3d 253, 257 (Alaska 2001); then citing *Flores v. Flores*, 598 P.2d 893, 895 (Alaska 1979); and then quoting *Richard B.*, 71 P.3d at 831).

[68]     *Id.* at 1228 (quoting *Richard B.*, 71 P.3d at 831).

[69]     *See In re K.L.J.*, 813 P.2d 276, 278-79 (Alaska 1991) (discussing how requirements of due process clause vary with circumstances, employing *Mathews* test to "determine what process is due," and identifying substantive right as the private interest affected).

whether those existing procedures sufficiently protect the underlying substantive interest. Fair trial rights already originate in the due process clause, are well established, and attach without any need for courts to engage in the *Mathews* balancing test.[70] Appending preexisting due process rights to the first *Mathews* factor to provide it additional weight is tautological — Alex asks us to grant more procedural protections because some procedural protections already exist, not because of any change to the underlying substantive interest or because the existing due process rights are shown inadequate.

Rather than giving separate weight to the various procedural rights independently established under the due process clause, inquiry under the first *Mathews* factor into "the private interest that will be affected"[71] is properly limited to the significance of the underlying substantive right requiring protection.[72] Whether attendant procedural rights were inadequate or unduly infringed is relevant in this context under the second *Mathews* factor, below — but only to the extent Alex demonstrates that additional safeguards would have "reduc[ed] the risk that [his] parental rights might be erroneously terminated."[73]

---

[70]     *See V.F. v. State*, 666 P.2d 42, 44-45 (Alaska 1983) ("*[T]he due process clause* of the Alaska Constitution *guarantees* the right to counsel in proceedings brought to terminate parental rights." (citation omitted) (emphasis added)); *Keith v. State*, 612 P.2d 977, 982-83 (Alaska 1980) (noting that "the due process right to a fair trial" would be infringed if the ability to affirmatively prove one's innocence were substantially limited).

[71]     *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

[72]     *See, e.g.*, *Seth D.*, 175 P.3d at 1227-28 (recognizing the right to custody as the relevant interest under the first *Mathews* factor); *Richard B.*, 71 P.3d at 831 (same).

[73]     *D.M. v. State, Div. of Family & Youth Servs.*, 995 P.2d 205, 212 (Alaska 2000).

**2.  Second factor:  The risk of erroneous deprivation and the probable value of additional procedural safeguards weigh against Alex.**

Under the second *Mathews* factor "a theoretical possibility of prejudice is not enough; . . . a court must assess 'the probable value' of [the requested procedure] in reducing the risk that parental rights might be erroneously terminated.  Thus, a court must consider the likelihood that [the requested procedure] might alter the outcome."[74]  To answer that question we "assess the ways which [the parent] claims she might have been prejudiced.  This is not the same as determining whether any constitutional error was harmless, but more fundamentally considers whether" failure to provide the requested procedure deprives the parent of a sufficient opportunity to present a case.[75]  "In deciding whether it might, we consider the issues presented in a termination proceeding, and a parent's ability to protect her interests at the . . . proceedings."[76]

Alex asserts that his inability to attend in person his parental rights termination trial risked impairing his right to counsel and his right to present a defense.  An analysis of the issues that were to be presented at Alex's termination trial demonstrates that granting the transport request was unlikely to have altered the proceedings' outcome.  A review of the record and Alex's single claim of actual prejudice confirms this "theoretical analysis."[77]

**a.  Alex's presence would not have reduced the risk that his parental rights might be erroneously terminated.**

---

[74]  *Id.*

[75]  *Id.*

[76]  *Id.* at 212-13.

[77]  *Id.* at 213.

Alex makes a number of assertions about the generic benefits of close attorney-client communication and in-person attendance and suggests that those benefits should weight the second *Mathews* factor in his favor because they "would have ensured Alex received a fundamentally fair trial." But we have previously held that the generic benefits of in-person attendance do not suffice to establish a per se due process right for a prisoner to be transported to a termination trial.[78] To establish a due process right to transport a prisoner must address the particular issues being determined at the termination trial and identify how in-person attendance would reduce the risk of an erroneous ruling on those issues.[79]

The issues to be decided at Alex's termination trial were circumscribed as a consequence of his criminal conviction. As discussed earlier Alex's conviction virtually foreclosed the possibility that his children would not be found in need of aid under AS 47.10.011(7).[80] And due to his incarceration the children would have been found in need of aid under AS 47.10.011(2), unless either Maeve could demonstrate that she was not absent and had not "committed conduct or created conditions" causing the children to be in need of aid, or Alex could demonstrate he had "made adequate

---

[78] *See Seth D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1222, 1227 (Alaska 2008) ("[C]ase law has not established a procedural due process right of incarcerated parents to be transported to parental rights termination trials."); *see also E.J.S. v. State, Dep't of Health & Soc. Servs.*, 754 P.2d 749, 752 (Alaska 1988) (holding that father's due process rights were not violated by telephonic participation in termination trial).

[79] *Cf. D.M.*, 995 P.2d at 212-14 (inquiring into particular issues to be addressed in due process case involving lack of advance notice).

[80] *See* AS 47.10.011 ("[T]he court may find a child to be a child in need of aid if it finds . . . (7) the child has suffered sexual abuse . . . as a result of conduct by . . . the child's parent . . . .").

arrangements" for the children.[81]  Alex largely conceded OCS's case against him; he ultimately argued only that there was no continuing danger to the children due to his incarceration and that Maeve's parental rights should not be terminated because she had not abused the children.  Maeve was represented by counsel and present at the trial to independently defend against allegations that she had caused the children to be in need of aid.  There is no reason to believe Alex's presence at the proceedings would have affected the court's ruling on that issue.

When addressing in his Proposed Findings of Fact and Conclusions of Law whether OCS made sufficient reasonable efforts to help the parents remedy their behavior that rendered the children in need of aid,[82] Alex deferred entirely to Maeve's arguments. It is unlikely Alex could have better assisted his attorney in arguing this issue during the trial had he attended in-person, as the record is clear that Alex had no personal knowledge of OCS's efforts because he had refused to engage with the caseworkers. Finally, it is unlikely Alex's in-person attendance would have assisted his attorney in litigating the best interests of the children.[83]  He had not been allowed visitation or contact with the children in two years, the children were themselves represented by a guardian ad litem, and the only argument he made on that issue in his Proposed Findings

---

[81]  AS 47.10.011(2) provides that a court may find a child to be in need of aid if the child's parent is incarcerated, "the other parent is absent or has committed conduct or created conditions that cause the child to be a child in need of aid . . . and the incarcerated parent has not made adequate arrangements for the child."

[82]  *See* AS 47.10.088(a)(3) (providing that before terminating parental rights the court must find OCS has complied with AS 47.10.086's "reasonable efforts" provisions); AS 47.10.086 (requiring, with exceptions, that OCS make "reasonable efforts to provide family support services . . . to enable the safe return of the child to the family home").

[83]  *See* AS 47.10.088(b)-(c) (requiring courts to consider the best interests of the child in termination proceedings and identifying some relevant considerations).

was to note the children had "never reported any abuse at the hands of their mother," a position Alex's counsel could assert at trial without Alex's presence. There is no indication that the superior court increased the risk of an erroneous ruling on any of these dispositive issues by denying Alex's transport request.

> **b.** **A review of the record confirms that Alex's interests were sufficiently protected without transport.**

Similar to *D.M. v. State, Division of Family & Youth Services*, "[o]ur theoretical analysis of the second *Mathews* prong is confirmed by our review of the record, and by [Alex's] failure to identify any plausible way that [he] was prejudiced in the termination proceedings."[84] Alex argues that "in-person attendance promotes fulfillment of the right to counsel." He notes that "the right to counsel is . . . illusory absent effective communication between the attorney and the parent," and that the "need for close communication is particularly compelling in termination trials, where the proceedings typically address many events over the course of several years" making "the client's recall and ability to consult with the attorney . . . critical." But Alex does not assert that he and his attorney were unable to effectively communicate. The superior court regularly ensured that Alex could hear the proceedings, and Alex consulted with his attorney in private throughout the trial.

Alex next argues that "a parent's personal presence protects the parent's right to present a defense," and notes that this is broader than merely the right to provide testimony. It includes, for instance, "the right to introduce evidence that might otherwise be barred by evidentiary rules" and the right "to confront and cross-examine witnesses and assist counsel during trial." Alex maintains that had he been present, he "could have proposed lines of questioning and assisted his attorney in deciding the best strategy for defending his parental rights. He could have filled in gaps in the facts and aided his

---

[84]    995 P.2d at 213.

attorney in reviewing exhibits for accuracy." But Alex fails to point to any evidence he would have introduced or lines of questioning he would have proposed had he attended the trial in person. He points to no factual gaps, and he fails to note that virtually all of the termination trial testimony was provided by two OCS caseworkers with whom he had refused to engage. There was no actual prejudice to his right to present a defense or indication that in-person attendance would have altered the outcome.

### c. The single instance of possible judicial interference does not demonstrate that Alex's presence would have reduced the risk of erroneous deprivation.

Alex asserts that a "colloquy" between his lawyer and the superior court regarding Alex's request to call his children as witnesses "impermissibly interfered with [his] attorney-client relationship and thus his defense," and that he has thereby established "more than a theoretical possibility that his rights to counsel and to present a defense were prejudiced by the court's decision to deny his transport motion." But the court's actions ultimately did not infringe on his attorney-client relationship, and Alex fails to demonstrate how his presence would have caused the court to act differently, prevented any prejudice, or altered the proceedings' outcome.

The exchange in question resulted from Alex's counsel's request to call Alex's children to testify. The attorney felt that the OCS permanency plans for the children might not be viable and that earlier testimony had called into question whether Alex's son wanted to terminate his relationship with his parents. The attorney requested the opportunity to call the children, explaining that she did not wish to revisit issues already litigated in the criminal trial and that she hoped to question them only about the permanency plans and their wishes concerning termination.[85]

---

[85] *See Karrie B. ex rel. Reep v. Catherine J.*, 181 P.3d 177, 184-85 (Alaska 2008) ("[A] court can also consider the fact that there are no favorable permanent (continued...)

The superior court was very reluctant to permit the children to testify after Alex had the opportunity to confront and cross-examine them in the criminal case. Presumably because of this reluctance, the court "questioned whether this request was coming directly from Alex," and required the attorney to "consult with [Alex] and represent in court that the father wants the children to testify as to what subjects." Alex's attorney in response "asked whether the court was suggesting that Alex, rather than his attorney, controlled the litigation strategy."[86] The court denied this suggestion, "but ultimately instructed Alex's attorney to consult with Alex for the purpose of representing to the court whether the decision to call the minors as witnesses was coming from Alex or his attorney."

Alex correctly finds some fault with the superior court's initial statement that the attorney was required to consult with her client and then "represent that's what the father wants to do." Quoting *Downie v. Superior Court*, Alex notes that the attorney-client privilege and Alaska Rule of Professional Conduct 1.6 "prohibit an attorney from disclosing the confidential communications between a lawyer and her client" and that "[t]his protection extends to 'confidences between attorney and client imparted for the

---

[85]    (...continued)
placement options for a child . . . as a factor in determining whether terminating a parent's rights would be in a child's best interests."); *see also Doe v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 272 P.3d 1014, 1023-24 (Alaska 2012) (upholding termination of parental rights in relation to some children but not others due to children's differing needs); *cf.* AS 25.24.150(c)(3) (providing child's preference is relevant to a best interests determination in the child custody context).

[86]    *See* Alaska R. Prof. Conduct 1.2(a) (stating that a lawyer must "abide by a client's decisions concerning the objectives of representation" but is only required to "consult with the client as to the means by which they are to be pursued").

purpose of securing legal advice or representation.' "[87]  Nonetheless OCS correctly observes that no attorney-client communications ultimately were revealed — after a recess the court confirmed that Alex's attorney had conferred with her client on the matter but did not require elaboration when the attorney simply stated that "[w]e don't intend to call any witnesses at this time."

More broadly, Alex argues that by even asking the question the court "put Alex and his attorney in an untenable position."  Because the court had "telegraphed its displeasure" about the attorney's desire to call the children to testify and then required the attorney to consult with her client, "Alex could reasonably expect the court to hold" it against him if he chose to support the attorney's request to call the children.  Alex maintains that "when a client stands to bear the consequences of an attorney's strategic decisions, the attorney is faced with an unfair choice:  proceed with the best defense strategy or acquiesce to the court.  The [superior] court should not have placed Alex's attorney in the position of making this choice."

But regardless of the propriety of the superior court's conduct, Alex fails to demonstrate how his presence in the courtroom would have substantively altered the events or prevented any negative consequences he believes resulted.  Alex asserts that "[t]he court would have recognized the impropriety of directly confronting Alex, as opposed to his attorney, in court.  The court may have questioned Alex's attorney regarding the request . . . , but the court would not have taken the unusual step of instructing the lawyer to report her client's perspective . . . ."  We conclude that to the extent Alex has identified impermissible judicial interference, he has failed to demonstrate the value his in-person presence would have had in reducing that interference and thereby decreasing the likelihood that his parental rights would be

---

[87]  888 P.2d 1306, 1308 (Alaska App. 1995); *see* Alaska R. Prof. Conduct 1.6; Alaska R. Evid. 503.

erroneously terminated. His judicial interference allegations are therefore unmoored from the relevant inquiry under the second *Mathews* factor: " 'the probable value' of [the requested procedure] in reducing the risk that parental rights might be erroneously terminated."[88]

### 3. Third factor: The cost and administrative burden of transporting Alex weigh against him because they would have resulted from his last-minute request.

The primary competing governmental interest that OCS asserts under the third *Mathews* factor is the cost and administrative burden of transporting Alex to court. The parties present the same arguments and considerations here as when discussing "the [S]tate's interest in avoiding the costs, administrative burdens, and diversion of its limited resources to transport of the prisoner" under the AS 33.30.081(f) analysis.[89] We incorporate our earlier analysis here: had Alex provided DPS more time to arrange its resources to accommodate his request, he would have a stronger argument that the costs attributed to him in the DPS opposition were impermissible. But the costs were unavoidable due to the unreasonably short time frame he provided DPS, and it is proper to attribute those costs to him for purposes of the *Mathews* test.

Alex asserts, citing *In re K.L.J.*, that the government's interest in avoiding the burdens of transport should be given less weight "given the fact that OCS shares an interest in obtaining just and accurate results in termination trials and in protecting the rights of indigent parents."[90] But *In re K.L.J.* dealt with whether a parent was entitled to

---

[88]     *D.M.*, 995 P.2d at 212.

[89]     *See supra* Section IV.A.1.d.

[90]     *See* 813 P.2d 276, 279-80 (Alaska 1991) (holding that the state "shares the parent's interest in an accurate and just decision," and so "the interests of both the state and the parent in the availability of appointed counsel coincide here").

appointed counsel,[91] and we decline to extend that reasoning to the prisoner transport context. To assume the State has an interest in Alex's in-person presence at the termination trial to ensure an adequate and just result presupposes the outcome of the inquiry under the second *Mathews* factor, above. Alex asserts no new arguments here that affect our determination that his presence was not essential to a just disposition, and so we elect not to discount OCS's asserted government interest as he suggests. This factor weighs slightly against Alex.

### 4. Weighing the factors: The superior court did not violate Alex's right to due process by declining to order his transport.

The first *Mathews* factor, "the private interest that will be affected by the official action,"[92] indisputably weighs in Alex's favor. The second *Mathews* factor, "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards,"[93] weighs against Alex. Alex fails to demonstrate how his in-person attendance could have altered the outcome of the proceedings or why his telephonic attendance increased the risk that the superior court would reach an erroneous result. Finally, the third *Mathews* factor, "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail,"[94] weighs slightly against Alex. In balance we conclude that Alex was not deprived of due process by the superior court's refusal to order his transport to his parental rights termination trial.

---

[91]     *Id.* at 278.

[92]     *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

[93]     *Id.*

[94]     *Id.*

## V.    CONCLUSION

We AFFIRM the superior court's decision terminating Alex's parental rights.